UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Cr. No. 19-189 (TSC) |
| | : | |
| **JEREMY LORENZO STEVENSON,** | : | |
| | : | |
| **Defendant.** | : | |

### SENTENCING MEMORANDUM

Mr. Jeremy Stevenson, through counsel, respectfully submits this Memorandum in Aid of Sentencing in anticipation of his sentencing hearing currently scheduled for January 29, 2021. Pursuant to the Rule 11(c)(1)(C) terms of the plea agreement, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), Mr. Stevenson is bound to request a sentence of no less than 33 months of incarceration, followed by a four year term of supervised release. *See* Plea Agreement, ECF #19, pg. 2. In sum, Mr. Stevenson respectfully requests that the Court impose a sentence that would be "sufficient, but not greater than necessary," to meet all of the statutory purposes of sentencing set forth in 18 U.S.C. § 3553.[1]

### Background

On June 6, 2019, Mr. Stevenson was arrested pursuant to the grand jury's return of a four-count indictment in this Court charging Mr. Stevenson with Count One, Unlawful Distribution of more than Five Grams of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii); Counts Two and Four – Using a Communication Facility to Facilitate a Drug Trafficking Felony, in violation of 21 U.S.C. § 843(b); and Count Three –

---

[1] All of the information and argument submitted in this memorandum is made in the context of the requirements of Federal Rule of Criminal Procedure 11(c)(1)(C). Mr. Stevenson acknowledges that this Court previously accepted his plea agreement and thus is mindful of its binding nature.

Unlawful Distribution of more than 50 Grams of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii).  A detention hearing was held on June 11, 2019, where Magistrate Judge Meriweather ordered Mr. Stevenson detained.  *See* ECF #10.

On March 3, 2020, this Court accepted Mr. Stevenson's guilty plea to Count One of the Indictment, Unlawful Distribution of more than Five Grams of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii) pursuant to a written plea agreement.  *See* ECF #19.  According to the terms of the plea agreement, pursuant to Rule 11(c)(1)(C), Mr. Stevenson must be sentenced within the range of 33 to 41 months, followed by a four year term of supervised release.  *Id*. at pg. 2.

A few weeks after this Court's acceptance of Mr. Stevenson's plea, the world changed.  On April 9, 2020, Mr. Stevenson requested emergency release from the D.C. Jail in light of the pandemic, as COVID-19 was raging through the D.C. Jail.  Ultimately, on April 16, 2020, Mr. Stevenson was released and placed on home confinement.  But for one incident that was previously addressed by this Court, Mr. Stevenson has been fully compliant with the terms of his release – 24 hours a day, 7 days a week, home confinement.  Currently, his sentencing hearing is scheduled for January 29, 2021, and Mr. Stevenson requests that this Court hold his sentencing hearing via video conference.

## **Sentencing Law**

The "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).

In determining such a sentence, the sentencing court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. *Id*. § 3553(a)(1). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. *Id.* § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is *not* an appropriate means of promoting correction and rehabilitation.

18 U.S.C. § 3582(a) (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." *Id*. § 3553(a) (emphasis added). For the reasons that follow, a sentence of 33 months is sufficient in this case, and all of the § 3553(a) factors support such a sentence.

### I.      The History and Characteristics of the Defendant.

From a very young age, Mr. Stevenson felt he was different. He struggled with his feelings, he struggled with his emotions, and he struggled in school. According to his mother, Mr. Stevenson was diagnosed with depression when he was in the 7th grade. *See* PSR ¶ 78, pg. 17. As he entered his teenage years, his family struggled with stable housing which led to

further instability for Mr. Stevenson.  In searching for something – perhaps a male role model who he lacked in his life - Mr. Stevenson started hanging out on the streets.  Unfortunately, his neighborhood did not provide mentoring or guidance, rather it brought violence and emotional harm to Mr. Stevenson.  Suffering with depression without much support, Mr. Stevenson struggled.

It was during this scary time that Mr. Stevenson started regularly using marijuana.  *See* PSR ¶ 75, pg. 17.  In an effort to self-medicate, Mr. Stevenson believed that smoking marijuana helped him escape the harsh realities of his life and get 'through his problems.'  The family's financial difficulties and the instability and trauma of inner-city street life took their toll on Mr. Stevenson.  Mr. Stevenson recalls feeling upset at the world, and confused about his emotional state.  Fortunately, Mr. Stevenson was able to remain in high school and he ultimately graduated in 2015.  *See* PSR ¶ 78, pg. 17.

Mr. Stevenson continued to drink alcohol and use drugs until he was arrested in this case.  Though he wanted to change and knew what the consequences of his drug usage and, ultimately, drug dealing would be, he could "only think for the moment," of his immediate needs and gratification in the short-term; he could not "focus on the future" or commit to the difficult task of changing his behavior.  Mr. Stevenson concedes that the only way to stop that cycle is to stop thinking for the moment and think for the future.

It is not at all surprising that Mr. Stevenson could "think only for the moment" and not "focus on the future" when he was arrested.  At that time, Mr. Stevenson was young and his brain was not fully developed.  The Supreme Court has recognized developments in psychology and brain science showing that juveniles (1) "have a lack of maturity and underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; (2) "are more

4

vulnerable to negative influences and outside pressures, including from their family and peers," "have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings"; and (3) possess character traits that are "less fixed" than those of an adult. *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (quotation marks and citations omitted). The Court has concluded that, because of these qualities, juveniles "have diminished culpability and greater prospects for reform." *Id.*; *see also Roper v. Simmons*, 543 U.S. 551, 569-70 (2005).

The "three significant gaps between juveniles and adults," enumerated above, that render juveniles less culpable and more capable of rehabilitation, extend well into young adulthood—the "transitional period that can range from age 18 to 24 and even beyond." *Reducing Recidivism & Improving Other Outcomes for Young Adults in the Juvenile & Adult Criminal Justice Systems*, Council of State Gov'ts Just. Center (Nov. 2015) at 2. During young adulthood, "significant brain development is still occurring and decision-making abilities are not fully mature." *Id.* Indeed, "evidence from developmental neuroscience suggests that young adult offenders ages 18-24 are, in some ways, more similar to juveniles than adults." Phil Bulman, *Young Offenders: What Happens & What Should Happen*, Nat'l Inst. Of Justice, U.S. Dep't of Justice (Feb. 2014) at 2.

Research shows that "psychosocial capabilities that improve decision making and regulate risk taking—such as impulse control, emotion regulation, delay of gratification, and resistance to peer influence—continue to mature well into young adulthood." James C. Howell et al., *Bulletin 5: Young Offenders & an Effective Response in the Juvenile & Adult Systems: What Happens, What Should Happen, & What We Need to Know*, Doc. No. 242935, at 17, Papers From the Study Group on Transitions From Juvenile Delinquency to Adult Crime, Nat'l

Inst. of Justice, U.S. Dep't of Justice (July 2013) (unpublished) (citation omitted).  Thus, "young adults simply do not have the physiological capacity of adults over age 25 to exercise judgment or control impulses," *id*. at 18, and it is "difficult to justify applying permanent or long-term sanctions to young offenders," including young adults in their early 20s, Carrie Mulford, *Explanations for Offending*, Nat'l Inst. Of Justice, U.S. Dep't Of Justice (May 2014) at 2; *see also* Wenk, *supra* (explaining that the frontal lobes of the brain, which "tell you that it's a bad idea to drink alcohol and drive or to ignore the consequences of taking heroin," do not finish developing in most men until age 30).

    The District of Columbia recently recognized as much by passing the Youth Rehabilitation Act Amendment of 2018, D.C. Pub. L. No. 22-197, 22 D.C. Stat. 451, which in relevant part, expanded the definition of "youth offender" in the Youth Rehabilitation Act to encompass persons "24 years of age or younger at the time that the person committed a crime." *See* D.C. Code § 24-901(6).[2]  Before the amendment, the Act applied only to those "less than 22 years old convicted of a crime."

    Mr. Stevenson grew up in an environment where drug use, addiction, and distribution were prevalent.  His adolescence when he began using drugs put him at increased risk for becoming dependent and addicted, and he has likely developed lasting physiological changes. *Science of Addiction* at 3.  "Although taking drugs at any age can lead to addiction, research shows that the earlier a person begins to use drugs, the more likely he or she is to develop serious problems," which "may be due to the harmful effect that drugs can have on the developing

---

[2]  The D.C. Youth Rehabilitation Act provides sentencing alternatives and leniency for youthful offenders and permits a suspended or probationary sentence rather than imprisonment.  *See* D.C. Code § 24-903.

6

brain." *Id*. at 9.  Using drugs "during this period of development may cause brain changes that have profound and long-lasting consequences." *Id*. at 10.

In addition, "[l]ong-term drug use impairs brain functioning." *Id.* at 18.  "Brain studies of people with addiction show physical changes in parts of the brain that are very important for judgment, making decisions, learning and memory, and controlling behavior," and "explains the harmful behaviors of addiction that are so hard to control."  *The Science of Drug Use: Discussion Points*, Nat'l Inst. on Drug Abuse, https://www.drugabuse.gov/related-topics/criminal-justice/science-drug-use-discussion-points (Feb. 2017).  Drug addiction is "a chronic, relapsing disorder characterized by compulsive drug seeking and use despite adverse consequences." *Science of Addiction* at 4.  It is not a choice, but rather "a brain disorder" that "involves functional changes to brain circuits involved in reward, stress, and self-control, and those changes may last a long time after a person has stopped taking drugs." *Id*.; *see also Drug Facts: Understanding Drug Use and Addiction*, Nat'l Inst. on Drug Abuse (June 2018), https://www.drugabuse.gov/publications/drugfacts/understanding-drug-use-addiction ("[R]epeated drug use can lead to brain changes that challenge an addicted person's self-control and interfere with their [sic] ability to resist intense urges to take drugs.").

It is clear that Mr. Stevenson' offense conduct in this case directly reflect his youth and struggle with untreated drug addiction as well as his mental health issues.  There is no question that at the time of his offense conduct Mr. Stevenson was addicted to alcohol and drugs, and thus his criminality is directly related to his drug addiction.  While this does not excuse his serious criminal conduct, it mitigates his culpability and supports a sentence at the low end range of the agreed upon term.

Mr. Stevenson relays that sobriety during the pendency of this case has been eye opening for him. He never before realized how much drugs were effecting his body and brain. With his mind clear, he now believes that his drug use and addiction was a major reason that he lost focus on reaching his goals. With his mind clear, he now notices that drugs side-tracked him from the important things in life that he wants and needs to accomplish. With his mind clear, he feels he can focus on his long term goals and be the man he wants to be, rather than the person he was letting himself become.

Since his release from the D.C. Jail in April 2020, Mr. Stevenson has been complaint with the condition of home confinement. Further, since the last hearing in this case, Mr. Stevenson has become a father. His son was born almost a month early and despite the frantic and emergent medical issue that prompted his son's arrival at the end of December 2020, Mr. Stevenson followed all the directives put to him by his pretrial services officer. Therefore, in light of his compliance, as well as the uncertainty of COVID-19 and his ability to receive a vaccine, Mr. Stevenson requests that his sentence be continued in a home confinement setting. As of this filing, Mr. Stevenson has served approximately 10 months at the D.C. Jail and approximately 9 months on home confinement, thereby totaling 19 months of confinement. In crediting that 19 month time period, this court can further fashion a 'custodial' sentence to continue his home confinement. Home confinement is treated as a form of "custody" under federal law, *see* 18 U.S.C. § 3624(c)(2) (allowing placement in home *19 confinement as "[p]rerelease custody"), and, indeed, "absconding from home confinement" can itself be a crime, *United States v. Ko*, 739 F.3d 558 (10th Cir. 2014) (absconding from home confinement constituted an 'escape' under federal escape statute, 18 U.S.C. § 751.

## II.      The United States Sentencing Guidelines

In imposing a sentence in this case, the Court must consider all of the factors set forth in 18 U.S.C. § 3553(a). *Gall v United States*, 552 U.S. 38 (2007).  In *United States v. Booker*, the Supreme Court excised the statutory section that once made the Sentencing Guidelines mandatory, rendering them advisory.  543 U.S. at 245; *see also United States v. Bras*, 483 F.3d 103, 105 (D.C. Cir. 2007).  Previously, sentencing courts were required to impose a within-Guidelines sentence unless circumstances warranted a departure.  *See* 18 U.S.C. § 3553(b)(1).  As a consequence of *Booker*, judges now must only "consider" the Guidelines "together with other sentencing factors."  *Booker*, 543 U.S. at 259 (emphasis added).  In so doing, a judge "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented."  *Gall v. United States*, 552 U.S. 38, 39 (2007).

The Supreme Court in *United States v. Rita*, 552 U.S. 338, 349 (2007) noted that some sections of the Guidelines are "the product of careful study based upon extensive empirical evidence derived from review of thousands of individual sentencing decisions."  The Supreme Court, however, recognized that "not all of the guidelines are tied to this empirical evidence."  *Gall*, 552 at 46, n.2.  Subsequent to *Rita,* the Court clarified that sentencing courts may vary from the Guidelines based on policy disagreements alone.  *Spears v. United States*, 555 U.S. 261 (2009).

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *id.* at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a).  *Kimbrough v United States*, 552 U.S. 85, 90 (2007).  The Court must "consider all of the § 3553(a) factors," "make an

9

individualized assessment based on the facts presented," *Gall,* 552 U.S. at 49-50, and explain how the facts relate to the purposes of sentencing. *Id.* at 53-60; *Pepper v. United States*, 131 S. Ct. 1229, 124243 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.* at 101; *Pepper*, 131 S. Ct. at 1242-43.

In determining an appropriate sentence in this case, this Court may properly find that the sentencing ranges for methamphetamine offenses lead to unwarranted sentencing disparities, thus in this case a sentence of 33 months is appropriate. The drug table in U.S.S.G. § 2D1.1(c) of the guideline identifies the base offense level for the type and quantity of drug involved. For methamphetamine, however, the Guidelines differentiate between two forms of methamphetamine powder - actual and mixture. *See* U.S.S.G. § 2D1.1(c). The base offense level for methamphetamine depends on the purity of the drug involved, using a 10:1 ratio to distinguish between pure, or "actual," methamphetamine and an equivalent total weight of a mixture containing methamphetamine. *Id.*

In this case, Mr. Stevenson pled guilty to and agreed to be accountable for 7 grams of actual methamphetamine. The guidelines therefore dictate a base offense level of 24 based on the actual amount of methamphetamine involved. *See* U.S.S.C. § 2D1.1(c)(8). Mr. Stevenson does not dispute this base offense level; however, he notes that if this 7 grams of methamphetamine were a 'mixture' the resulting base offense level would be 14. *See* U.S.S.C. § 2D1.1(c)(13). This ten point difference can be properly considered when determining a sentence in this case. *See United States v. Carrillo*, 440 F.Supp.3d (E.D. CA 2020)(policy disagreement with methamphetamine guidelines); *United States v. Rodriguez*, 382 F.Supp.3d 892 (D. Alaska 2019)(held that Guidelines sentencing ranges for methamphetamine offenses led to unwarranted

sentence disparities, warranting routine downward variances); *United States v. Johnson*, 379 F.Supp.3d 1213 (N. Div. AL 2019)(downward variance imposed based, in part, on policy disagreement with methamphetamine guidelines); and *United States v. Nero*, 2021 WL 141785, (D. Idaho 2021)(memorandum on policy disagreement with methamphetamine guidelines).

Therefore, imposing a sentence at the low end of the agreed upon range is consistent with what courts have been doing across the country. Further, a sentence of 33 months does not demonstrate an unwarranted sentencing disparity of offenders with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553 (a)(6).

### A. The Guidelines Overstate Mr. Stevenson' Criminal History, Which Reflects His Youth, Diminished Culpability, And Greater Prospects For Reform.

Mr. Stevenson's criminal history is dated and youthful, and thus his placement into criminal history category II overstates the likelihood that he will commit future crimes, particularly in light of the extraordinary rehabilitation he has demonstrated since the spring of 2019. One of his prior convictions occurred when he was 19 years old and the other when he was 23. *See* PSR ¶ 41, pg. 10; ¶ 44, pgs. 11-12.

Current brain science makes clear that "late adolescents," or those between ages 18 and 21, think and act more like teenagers than previously thought, so that the hallmark characteristics of juveniles that the Supreme Court, in *Miller v. Graham*, 567 U.S. 460 (2012), indicated make them less culpable and more capable of change apply equally to this age group. This research started to coalesce "'as we moved into 2010 and beyond,'" and has built up over the past decade, and thus would not have been readily available to this Court in 2011. *See Cruz v. United States*, 2018 WL 1541898, at *25 (D. Conn. Mar. 29, 2018) (quoting testimony of Dr. Laurence Steinberg, professor of psychology at Temple University, about the science of "late

11

adolescence"). This science makes clear that Mr. Stevenson's involvement in drugs was a product of his youthfulness, and explains why he is no longer dangerous.

The most up-to-date research shows that (1) "hot cognition [which] requires the individual to regulate and control his emotions . . . is not fully mature until the early-or mid-20s"; (2) late adolescents "still show problems with impulse control and self-regulation and heightened sensation-seeking, which would make them in those respects more similar to somewhat younger people than older people"; (3) "the ability to resist peer pressure is still developing during late adolescence"; and (4) importantly, "*people in late adolescence are . . . more capable of change than are adults*." *Cruz*, 2018 WL 1541898, at *24 (internal quotation marks and citations omitted) (emphasis added). The import of this research is that Mr. Stevenson made poor choices, but that is neither the sum-total of who he was nor reflective of who he has become. As further evidenced by his actions, notably his actions since his release in April 2020, at 26 years old, Mr. Stevenson is able to make rational, adult decisions that he was unable to do in his late teenage years and early twenties.

Notably, Mr. Stevenson experienced childhood trauma, including, though in no way limited to, the rough neighborhood in which he was raised, and the struggles of his mother to protect him and his siblings. See PSR ¶ 56-61, pgs. 14-15. Researchers are increasingly understanding the interaction between "adverse childhood experiences" (commonly known as "ACEs") and those individuals who become involved in the criminal justice system. ACEs "is the term given to describe all types of abuse, neglect, and other traumatic experiences that occur to individuals under the age of 18." *See* CDC, Adverse Childhood Experiences, available at https://vetoviolence.cdc.gov/apps/phl/resource_center_infographic.html (last accessed Dec. 20, 2019).

As the CDC reports, "[t]oxic stress from ACEs can change brain development and affect how the body responds to stress." *See* CDC, VitalSigns: Adverse Childhood Experiences, available at https://www.cdc.gov/vitalsigns/aces/pdf/vs-1105-aces-H.pdf "Although parental support can attenuate the effects of repeated exposure to extremely traumatic events, this support tends not to be available to [those] who need it most," who have parents who are "either abusive (i.e., perpetrators of the abuse) or neglectful (i.e., they have failed to protect the child from exposure to the violence)." *See* Richard G. Dudley, Jr., MD, "Childhood Trauma and Its Effects: Implications for Police" at 3, National Institute of Justice and Harvard Kennedy School (July 2015), available at https://www.ncjrs.gov/pdffiles1/nij/248686.pdf "This repeated violent traumatization in the absence of parental nurture and protection is toxic to developing children," with several devastating results. *Id.*

First, the overproduction of stress hormones (often called the "fight or flight response") triggered by repeated trauma "eventually impairs regulation of the response"; that is, "the 'flight of flight response' . . . becomes a constant, uncontrollable physiological warning of danger that persists even when no danger is present." *Id.* at 5. Second, "many trauma-exposed children also develop psychological trauma-related symptoms similar to those seen in adults with posttraumatic stress disorder (PTSD)," including anxiety, hypervigilance,[3] and being "hyperreactive to perceived threats of danger." *Id.* Third, other developmental difficulties like "instability in their sense of self," "intense but unstable relationships" due in part to a "frantic need for attachments," "inappropriate and intense outbursts of anger, or difficulty controlling anger," and the "attempt to block out or mask intense anxiety and fear with a tough, 'I don't care

---

[3] Hypervigilance means that individuals "are always expecting something bad to happen to them and they often perceive danger where none exists." *Id.* at 6.

13

about anything' façade." Finally, depression and substance abuse "further impair the decision-making mechanisms that exposure to trauma has already compromised."

Mr. Stevenson' offense conduct must be viewed in light of the many maladaptations and psychiatric/neuropsychiatric problems that develop when a child is neglected and mistreated. This Court is now in a unique position to acknowledge the changes in Mr. Stevenson since he was a young man. As the brain science described above makes clear, because he was so young at the time of these crimes, he had a greater capacity for change than had he been a fully formed adult. Mr. Stevenson was imprisoned for over 10 months, and has most recently been on home confinement for the past 9 months, and in that time he has matured and grown and is no longer a danger to the community.

### B. Relying on Criminal History in Sentencing is Not Justified by Theories of Punishment and Has a Racially Disparate Impact.

Scholars recognize that "[i]t is difficult . . . to find a principled justification for increasing the severity of punishment because of an individual's criminal history" and that "criminal history is entangled with racial bias and foreseeable disparate racial effects." Michael Tonry, *Predictions of Dangerousness in Sentencing: Déjà Vu All Over Again*, 48 Crime & Justice 439, 461 (2019).

Consequently, the recently finalized *Model Penal Code: Sentencing* warns against the use of criminal history in sentencing. It cautions against using criminal history "for purposes of assessing offenders' blameworthiness for their current offenses" because "offenders have already been punished for their prior convictions." Model Penal Code: Sentencing, Proposed Final Draft § 6B.07(1) (Apr. 10, 2017). It cautions against using criminal history "for purposes of assessing an offender's risk of reoffending" because "the use of criminal history by itself may over-predict those risks." *Id*. And, it cautions against using criminal history because of "the danger that the

14

use of criminal-history provisions to increase the severity of sentences may have disparate impacts on racial or ethnic minorities, or other disadvantaged groups." *Id*. With respect to the last, the commentary explains, "An accumulating body of research indicates that criminal-history formulas in sentencing guidelines are responsible for much of the 'unexplained' disparities in black and white incarceration rates—that is, disparities cannot be 'accounted for' by differential rates of crime commission, arrest, and conviction." *Id*. cmt. c(3).

"Racial differences in criminal history are a primary cause of racial disparities in imprisonment." Tonry, 48 Crime & Justice 439, 458. Studies have shown that "criminal history factors disproportionately affect blacks" because they are "arrested at younger ages and more often than white people for reasons that have as much to do with racially differentiated exercises of police discretion as with racial differences in offending behavior." *Id*. at 462-63. Police practices, including racial profiling and police targeting of poor and minority neighborhoods and individuals, inflate the criminal records of minority individuals compared with other people. *Id*. In addition, "Blacks are much more likely than whites to be mislabeled as dangerous and, if this is reflected in sentencing, to be punished more severely than they otherwise would be." *Id*. at 458; *see also* Tonry, 48 Crime & Justice 1, 15.

### C. A Sentence of 33 Months will Sufficiently Deter Mr. Stevenson from Future Conduct and will not Demonstrate an Unwarranted Sentencing Disparity

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very

effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").

In addition, Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety." *Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst., 21 (Jan. 2016). This is consistent with a "body of research demonstrat[ing] that longer sentences do not reduce recidivism more than shorter sentences." Austin, Brennan Ctr., *supra*, at 35. With respect to general deterrence, studies also "indicate that long prison sentences have little or no impact on reducing the criminal behavior of the public at large" because "most people consider immediate circumstances and emotions instead of longer term legal consequences when acting or reacting." *Id*.

Significantly, there is no empirical research supporting the assumption that progressively tougher or punitive sanctions for repeat offenders are more effective than the same or lesser sanctions. Daniel P. Mears & Joshua C. Cochran, *Progressively Tougher Sanctioning & Recidivism: Assessing the Effects of Different Types of Sanctions*, Journal of Research in Crime & Delinquency 1, 34 (2017) ("Scholarship in deterrence does not uniformly anticipate that more severe sanctions will provide a greater specific deterrent, and some research suggests that they may worsen offending."). By contrast, research has shown probationary sentences to be more effective in deterring repeat offenders, including for those previously sentenced to imprisonment,

than more severe subsequent sanctions of imprisonment.  *Id*. at 32-33.  Research has also shown that probation is equally effective as prison for even individuals labeled "*violent* offenders." Austin, Brennan Ctr., *supra*, at 22 (emphasis in original).

With respect to sentencing disparities, Sentencing Commission research found that "Black male offenders received sentences on average 19.1 percent longer than similarly situated White male offenders," even accounting for any history of violence.  USSC, *Demographic Differences in Sentencing: An Update to the 2012* Booker *Report*, 2 (Nov. 2017).

Scholars note that "[t]here are no good reasons to believe [judicial decision-making] is the only, or even the greatest, source of unfair racial disparity" in federal sentencing.  Paul J. Hofer, 48 Crime & Just. 137, 162.  The Commission's report does not account for how the Guidelines themselves contribute to disparities.  The Guidelines "may encode racial biases, producing sentencing disparities in the absence of racially discriminatory decision making by judges."  Ryan D. King & Michael L. Light, *Have Racial & Ethnic Disparities in Sentencing Declined?*, 48 Crime & Justice 365, 416-17 (2019).  Studies show "that sentencing guidelines are structured in ways that systematically produce inequalities . . . , for instance, by permitting judges to consider aggravating factors such as juvenile history that disproportionately affect blacks . . . or by mandating more severe punishments for crimes with high racial imbalances in the arrest rate."  *Id*. at 417 (citations omitted).  Also, "[p]unishments are often most severe for young, minority men."  *Id*. at 371.  Harsher prior punishments lead to more criminal history points in the federal guidelines.

Indeed, an analysis of federal sentencing data from 1992 to 2016 concluded that "much of the disparity in black-white sentence lengths is driven by differences in their presumptive sentences.  In other words, the observed disparities in sentence length are largely due to

adherence to the sentencing guidelines." *Id*. at 383. Scholars note that the gap between black and white offenders narrowed following the decisions in *Booker*, *Rita*, and *Kimbrough*. *See* Hofer, 48 Crime & Just. at 171. However, "unsound rules, such as the so-called career offender guideline, other drug recidivist provisions, and firearms statutes continue to contribute to racial disparity without advancing the purposes of sentencing." *Id*. at 173.

As discussed above, criminal history increases Mr. Stevenson's Guidelines range in this case. Because racial minorities are arrested and convicted in disproportionate numbers relative to similarly-situated whites, criminal history has an unjustified disparate impact on racial minorities, like Mr. Stevenson, that is readily apparent in this case. Accordingly, this Court should impose a sentence at the low end of the agreed upon range – 33 months.

## **CONCLUSION**

For the above-stated reasons, as well as any other the Court deems just and proper, the defense respectfully requests that the Court sentence Mr. Stevenson to 33 months followed by a term of four years of supervised release.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

\_/s/_____
Dani Jahn
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500